(109 App. Div. 418)

## HOOD v. LEHIGH VALLEY R. CO.

(Supreme Court, Appellate Division, Fourth Department.   November 15, 1905.)

RAILROADS—CROSSING ACCIDENT—CONTRIBUTORY NEGLIGENCE.

Where deceased, with an unimpeded view of an oncoming train, with hearing and sight not sufficiently impaired to palliate utter lack of attention, while driving a team which were not uncontrollable, kept his team trudging along, either entirely oblivious of his duty to himself or else deluded in the belief that he could pass a railroad crossing safely ahead of an approaching train, he was guilty of contributory negligence, precluding a recovery for his death in a collision ensuing between the train and his vehicle.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Railroads, § 1080.]

Appeal from Trial Term, Genesee County.

Action by Polly A. Hood, administratrix, etc., of Isaac Hood, deceased, against the Lehigh Valley Railroad Company. From a judgment in favor of defendant, and an order denying a new trial, plaintiff appeals. Affirmed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and NASH, JJ.

William E. Prentice, for appellant.
James McC. Mitchell, for respondent.

SPRING, J. The plaintiff's intestate, Isaac Hood, on January 8, 1900, was struck by an east-bound fast freight train on the defendant's railroad at Ellicott street crossing in the village of Batavia and instantly killed. He was riding in a lumber wagon loaded with potatoes, and was driving an old team and going from his farm to Batavia southerly along Ellicott street at the time of the collision. This street is 76 feet in width and extends in a southeasterly and northwesterly direction. At the crossing there are three tracks, the southerly of which was used for east-bound trains. West of the crossing and about 1,000 feet distant is the depot. The highway is level as it approaches the crossing, and the defendant's tracks towards the west are straight for several miles, and the view of an approaching train is practically unobstructed for a long distance. North of the railroad tracks and along the westerly side of Ellicott street were four maple trees, the nearest to the crossing about 150 feet, and a space between them of 30 feet. These trees were each about 15 inches in diameter and the lowest limbs about 8 feet from the ground, and they were devoid of foliage. While the claim is made that these trees impeded the vision of the traveler along the street, yet they cannot be regarded as substantial obstacles. Every tree or pole in a highway cannot be made the excuse for a man's failure to observe a coming train, and it is not to be assumed that he casts his eyes trainward just at the nick of time when the tree or pole may possibly be in the focus of his vision. Still further to the north, on the westerly side of the highway and more than 450 feet distant from the crossing, was an orchard. Mr. Hood was killed about 3 o'clock in the afternoon. The weather was clear, but cold. He had lived for more than 30 years within three miles of the highway crossing and must have been familiar with it and with the

surroundings generally.   He was 73 years of age, vigorous, active, and intelligent.   His horses approached the crossing at a shacking gait, either a fast walk or a slow trot.   He turned his head in either direction as he came near the crossing, but his team did not stop or abate their speed.   When close to the crossing, they reared and jumped and were about over the southerly track, when the collision occurred.

We may assume the negligence of the defendant in omitting to give any signal of the approach of the train.   There is, however, no sufficient proof to exonerate the intestate from carelessness.   With an unimpeded view of the oncoming train, he kept his team trudging along, either entirely oblivious of his duty to himself, or else deluded in the belief that he could pass safely ahead of the train.   There is proof that his team, when close to the danger point, "jumped" or "pranced," but not sufficient to show that they were uncontrollable.   In any event, by his own inattention or desire to hurry over he had allowed his horses to approach close to the crossing, so, if they did become frightened and unmanageable, he was primarily responsible for permitting them to get near to the train when he should have avoided the peril. Nor do we think the case is one where the principle applies that a person confronted with a sudden peril is not responsible if he fails to act discreetly.   The emergency, if any, was created by Mr. Hood, and did not arise until he had been negligent in approaching the crossing.

It is urged, in extenuation of his conduct, that his eye-sight and hearing were defective.   Infirmities of this kind often have an important bearing when negligence is imputed to their possessor.   The evidence relating to these infirmities does not however uphold the broad scope credited to it.   The widow, in describing the intestate, testified:

"Mr. Hood's health was pretty good for his age.   He was not a sick man. He could not hear very well.   He was quite deaf.   He could not see very well.   If any one passed along the road, he would ask some of us who they were.   He could read with his glasses on.   Did not drive with his glasses. Never wore his glasses on the road."

His daughter said:

"Did all kinds of farm work, but plowing.   My father was quite deaf. If we blew the dinner horn, he could hear that to come to his dinner.   He used to come.   He used to converse with members of the family, if we were near enough.   My father's vision was not first-rate.   He often would ask who people were who were passing.   If I should meet him on the highway, he didn't know me until I was quite close to him."

The fact that he could not distinguish people casually met is far from indicating that he could not readily see an approaching train.   The proof further shows that he did the work on his farm, managed his team, doing his chores and all the labor, except plowing, incident to carrying on a farm of 65 acres.   He was an old man, but physically strong, and as alert as men usually are at that age.   He was often on the road with his team and knew how to handle them.   His faculties were not impaired sufficiently to palliate his utter lack of attention when approaching this crossing.

The judgment should be affirmed, with costs.   All concur.